# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

**MANDATE**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 25th day of February, two thousand and nineteen.

Before:     Dennis Jacobs,
              Rosemary S. Pooler,
              Richard C. Wesley,
                  *Circuit Judges.*

_____

In Re: Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC.

_____

**JUDGMENT**

Docket Nos. 17-2992 (L), 17-2995, 17-2996, 17-2999, 17-3003, 17-3004, 17-3005, 17-3006, 17-3007, 17-3008, 17-3009, 17-3010, 17-3011, 17-3012, 17-3013, 17-3014, 17-3016, 17-3018, 17-3019, 17-3020, 17-3021, 17-3023, 17-3024, 17-3025, 17-3026, 17-3029, 17-3032, 17-3033, 17-3034, 17-3035, 17-3038, 17-3039, 17-3040, 17-3041, 17-3042, 17-3043, 17-3044, 17-3047, 17-3050, 17-3054, 17-3057, 17-3058, 17-3059, 17-3060, 17-3062, 17-3064, 17-3065, 17-3066, 17-3067, 17-3068, 17-3069, 17-3070, 17-3071, 17-3072, 17-3073, 17-3074, 17-3075, 17-3076, 17-3077, 17-3078, 17-3080, 17-3083, 17-3084, 17-3086, 17-3087, 17-3088, 17-3091, 17-3100, 17-3101, 17-3102, 17-3106, 17-3109, 17-3112, 17-3113, 17-3115, 17-3117, 17-3122, 17-3126, 17-3129, 17-3132, 17-3134, 17-3136, 17-3139, 17-3140, 17-3141, 17-3143, 17-3144, 17-3862

The appeals in the above captioned case from judgments of the United States Bankruptcy Court for the Southern District of New York were argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgments of the Bankruptcy Court are VACATED and the matter is REMANDED for further proceedings consistent with this Court's Opinion.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe—Clerk
United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe*

*Catherine O'Hagan Wolfe*

17-2992(L)
*In re Picard*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

——————————

August Term 2018

(Argued: November 16, 2018 | Decided: February 25, 2019)

Docket Nos. 17-2992(L),
17-2995, 17-2996, 17-2999, 17-3003, 17-3004, 17-3005, 17-3006, 17-3007, 17-3008,
17-3009, 17-3010, 17-3011, 17-3012, 17-3013, 17-3014, 17-3016, 17-3018, 17-3019,
17-3020, 17-3021, 17-3023, 17-3024, 17-3025, 17-3026, 17-3029, 17-3032, 17-3033,
17-3034, 17-3035, 17-3038, 17-3039, 17-3040, 17-3041, 17-3042, 17-3043, 17-3044,
17-3047, 17-3050, 17-3054, 17-3057, 17-3058, 17-3059, 17-3060, 17-3062, 17-3064,
17-3065, 17-3066, 17-3067, 17-3068, 17-3069, 17-3070, 17-3071, 17-3072, 17-3073,
17-3074, 17-3075, 17-3076, 17-3077, 17-3078, 17-3080, 17-3083, 17-3084, 17-3086,
17-3087, 17-3088, 17-3091, 17-3100, 17-3101, 17-3102, 17-3106, 17-3109, 17-3112,
17-3113, 17-3115, 17-3117, 17-3122, 17-3126, 17-3129, 17-3132, 17-3134, 17-3136,
17-3139, 17-3140, 17-3141, 17-3143, 17-3144, 17-3862.

IN RE: IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD
L. MADOFF INVESTMENT SECURITIES LLC

——————————

Before:

JACOBS, POOLER, AND WESLEY, *Circuit Judges*.

These eighty-eight consolidated appeals come from dozens of related orders of the United States Bankruptcy Court for the Southern District of New York (Bernstein, *J.*). Plaintiff-Appellant Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("Madoff Securities"), alleges that Madoff Securities transferred property to foreign entities that subsequently transferred it to other foreign entities, including the hundreds of Appellees. The

Trustee contends that Madoff Securities' transfers are avoidable (meaning "voidable") as fraudulent under § 548(a)(1)(A) of the Bankruptcy Code. He thereby seeks to recover the property from the Appellees using § 550(a)(2) of the Bankruptcy Code. These actions were dismissed on the grounds that the presumption against extraterritoriality and international comity principles limit the scope of § 550(a)(2) such that the trustee of a domestic debtor cannot use it to recover property that the debtor transferred to a foreign entity that subsequently transferred it to another foreign entity. We disagree and hold that neither doctrine bars recovery in these actions. Accordingly, we **VACATE** the judgments of the bankruptcy court and **REMAND** for further proceedings.

————————————

ROY T. ENGLERT, JR., Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C. (David J. Sheehan, Seanna R. Brown, Torello H. Calvani, Catherine E. Woltering, Baker & Hostetler LLP, New York, NY, *for Plaintiff-Appellant Irving H. Picard*; Howard L. Simon, Windels Marx Lane & Mittendorf, LLP, New York, NY; Matthew B. Lunn, Young Conaway Stargatt & Taylor, LLP, New York, NY, *Special Counsel for the Trustee, on the brief*), *for Plaintiff-Appellant*.

JOSEPHINE WANG, General Counsel (Kevin H. Bell, Senior Associate General Counsel for Dispute Resolution, Nathanael S. Kelley, Associate General Counsel, *on the brief*), Securities Investor Protection Corporation, Washington, D.C., *for Intervenor Securities Investor Protection Corporation*.

FRANKLIN B. VELIE, Sullivan & Worcester LLP, New York, NY; THOMAS J. MOLONEY, Cleary Gottlieb Steen & Hamilton LLP, New York, NY (Diarra M. Guthrie, Samuel P. Hershey, Cleary Gottlieb Steen & Hamilton LLP, New York, NY; Timothy P. Harkness, David Y. Livshiz, Jill K. Serpa, Freshfields Bruckhaus Deringer US LLP, New York, NY; Marshall R. King, Gibson, Dunn & Crutcher LLP, New York, NY; Jonathan G. Kortmansky, Mitchell C. Stein, Sullivan & Worcester LLP, New York, NY, *on the brief*), *for Defendants-*

Appellees *HSBC Holdings plc*, et al., *UBS AG*, et al., *First Peninsula Trustees Limited*, et al., *and BA Worldwide Fund Management Limited*.

Eugene R. Licker, Ballard Spahr LLP, New York, NY, *for Defendants-Appellees Lighthouse Investment Partners, LLC, Lighthouse Supercash Fund Limited, and Lighthouse Diversified Fund Limited*.

Dean A. Ziehl (Harry D. Hochman, Alan J. Kornfeld, *on the brief*), Pachulski Stang Ziehl & Jones LLP, New York, NY, *for Amicus Curiae National Association of Bankruptcy Trustees, in support of Plaintiff-Appellant*.

Roger P. Sugarman, Kegler, Brown Hill + Ritter, Columbus, OH, *for Amici Curiae Professors of Conflict of Laws, in support of Plaintiff-Appellant*.

Andrea Dobin (Henry M. Karwowski, *on the brief*), Trenk, DiPasquale, Della Fera & Sodono, P.C., West Orange, NJ, *for Amici Curiae Bankruptcy Law Professors, in support of Appeal and Reversal*.

David Molton, Brown Rudnick LLP, New York, NY, *for Amicus Curiae Kenneth Krys, as Liquidator and Foreign Representative of Fairfield Sentry Limited, Fairfield Sigma Limited, and Fairfield Lambda Limited, in support of Plaintiff-Appellant and partial reversal*.

Daniel M. Sullivan (Matthew Gurgel, Benjamin F. Heidlage, *on the brief*), Holwell Shuster & Goldberg LLP, New York, NY, *for Amici Curiae Brian Child, Christopher Hill, Nilani Perera, Martin Trott, and Andrew Willins, in support of Defendants-Appellees*.

George T. Conway III (Emil A. Kleinhaus, Joseph C. Celentino, *on the brief*), Wachtell, Lipton, Rosen & Katz, New York, NY, *for Amicus Curiae Securities Industry and Financial Markets Association, in support of Defendants-Appellees*.

Richard A. Kirby, FisherBroyles, LLP, Washington, D.C. (Carole Neville, Dentons, New York, NY; Richard Levy, Pryor Cashman LLP, New York, NY, *on the brief*), *for Amici Curiae Lanx BM Investments, LLC*, et al., *in support of Defendants-Appellees.*

_____

WESLEY, *Circuit Judge*:

These eighty-eight consolidated appeals arise from the ongoing fallout of Bernard Madoff's Ponzi scheme. As alleged, Bernard L. Madoff Investment Securities LLC ("Madoff Securities") fraudulently transferred billions of dollars to foreign investors, including the feeder funds at issue here. These feeder funds, the initial transferees of that property, subsequently transferred it to other foreign investors, a group that includes the hundreds of Appellees. Irving H. Picard, the Appellant and Trustee for the Liquidation of Madoff Securities, alleges these transfers are fraudulent, and thus avoidable (meaning "voidable"), under § 548(a)(1)(A) of the Bankruptcy Code. Invoking § 550(a)(2) of the Bankruptcy Code, the Trustee sued the Appellees to recover the property. The question before us is whether, where a trustee seeks to avoid an initial property transfer under § 548(a)(1)(A), either the presumption against extraterritoriality or international comity principles limit the reach of § 550(a)(2) such that the trustee cannot use it

4

to recover property from a foreign subsequent transferee that received the property from a foreign initial transferee.

Following an order of the United States District Court for the Southern District of New York (Rakoff, *J.*),[1] the United States Bankruptcy Court for the Southern District of New York (Bernstein, *J.*)[2] dismissed the Trustee's actions, holding in each that either the presumption against extraterritoriality or international comity principles prevent the Trustee from using § 550(a)(2) to recover this property. We disagree and hold that neither doctrine bars recovery in these actions. Accordingly, we vacate the judgments below and remand to the bankruptcy court for further proceedings.

## BACKGROUND

Bernard Madoff orchestrated the largest Ponzi scheme in history through Madoff Securities, his New York investment firm. He enticed investors to buy into alleged investment funds by promising returns that seemed, and were, too good to be true. Rather than invest the money, Madoff commingled it in a checking

---

[1] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*SIPC I*), 513 B.R. 222 (S.D.N.Y.), *supplemented by* 12-MC-115, 2014 WL 3778155 (S.D.N.Y. July 28, 2014).

[2] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*SIPC II*), AP 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016).

account he held with JPMorgan Chase in New York. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 59–60 (2d Cir. 2013). When investors wanted to withdraw their funds, Madoff sent them checks from this account. *Id.* at 73. In effect, Madoff paid his investors using money he received from other investors. In 2008, his fraudulent enterprise collapsed.

On December 15, 2008, the Securities Investment Protection Corporation, acting pursuant to the Securities Investor Protection Act of 1978 ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, petitioned the United States District Court for the Southern District of New York for a protective order placing Madoff Securities into liquidation. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 84 (2d Cir. 2014). As we previously explained:

> SIPA establishes procedures for the expeditious and orderly liquidation of failed broker-dealers, and provides special protections to their customers. A trustee's primary duty under SIPA is to liquidate the broker-dealer and, in so doing, satisfy claims made by or on behalf of the broker-dealer's customers for cash balances. In a SIPA liquidation, a fund of "customer property" is established—consisting of cash and securities held by the broker-dealer for the account of a customer, or proceeds therefrom, 15 U.S.C. § 78*lll*(4)—for priority distribution exclusively among customers, *id.* § 78fff–2(c)(1). The Trustee allocates the customer property so that customers "share ratably in such customer property . . . to the extent of their respective net equities." *Id.* § 78fff–2(c)(1)(B).

*Id.* at 85 (alteration in original) (citation omitted). The Southern District court issued the protective order, appointed Picard as Trustee, and referred the case to the United States Bankruptcy Court for the Southern District of New York. *Id.* at 84–85 (citing Order, *SEC v. Bernard L. Madoff and Bernard L. Madoff Inv. Sec. LLC,* 08-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4).

Some debtors, such as Madoff Securities, complicate a SIPA trustee's task by unlawfully transferring customer property prior to the formation of a liquidation estate. To ensure that these transfers do not prevent a trustee from ratably distributing customer property, SIPA authorizes trustees to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of [the Bankruptcy Code]." 15 U.S.C. § 78fff–2(c)(3).

The Bankruptcy Code, in turn, provides various means for trustees to avoid a debtor's transfers and, to the extent that a transfer is avoided, to recover the transferred property. *See* 11 U.S.C. §§ 541 *et seq.* Section 550(a)(1) allows trustees to recover property from the debtor's initial transferee. And § 550(a)(2) permits a trustee to recover property from any subsequent transferee.

Many of Madoff Securities' direct investors were "feeder funds." A feeder fund is an entity that pools money from numerous investors and then places it into a "master fund" on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money.

Three foreign feeder fund networks that invested with Madoff Securities are relevant to many of these appeals:

- Fairfield Greenwich Group is a network of funds operating in New York whose funds are organized in the British Virgin Islands ("BVI"), where Fairfield is in liquidation. In those proceedings, the bankruptcy court found, liquidators other than Picard have "brought substantially the same claims [that Picard brings here] against substantially the same group of defendants to recover substantially the same transfers [that Picard seeks to recover]." *SIPC II*, 2016 WL 6900689, at *13.

- The Kingate Funds is a network of funds organized in the BVI. Kingate is currently in liquidation proceedings in the BVI and Bermuda. Liquidators in those nations have brought substantially the same claims Picard brings here "against substantially the same defendants to recover substantially the same transfers" with "limited success." *Id.* at *14.

- The Harley International (Cayman) Limited Funds network is located in the Cayman Islands, where it is currently in liquidation. Picard pursued some relief in those proceedings in 2010.

Many of these feeder funds placed all or substantially all of their assets into Madoff Securities' investment vehicles. Fairfield, for example, invested 95% of its funds with Madoff Securities.

When a feeder fund investor wants to withdraw her money, she effectively needs to recover it from the master fund. The investor initiates a withdrawal by informing the feeder fund, which itself makes a withdrawal request from the master fund. The master fund then transfers the money to the feeder fund (the initial transfer), which subsequently transfers the money to its investor (the subsequent transfer).

Because Madoff Securities did not invest the money it received from the feeder funds, the invested funds accrued no actual gains, despite representations to the contrary by Madoff Securities personnel. When a feeder fund's investor initiated a withdrawal, Madoff Securities transferred commingled investor money from its JPMorgan Chase account in New York to the feeder fund, which subsequently transferred the money to its investor.



The hundreds of Appellees are foreign subsequent transferees that invested in foreign feeder funds. In the bankruptcy court below, the Trustee sued the Appellees under § 550(a)(2) of the Bankruptcy Code to recover property the Appellees allegedly received from Madoff Securities via foreign feeder funds.[3] The Trustee contended that Madoff Securities' initial transfers to the feeder funds were avoidable as fraudulent under § 548(a)(1)(A) of the Bankruptcy Code.

The United States District Court for the Southern District of New York, Judge Rakoff, withdrew the reference to the bankruptcy court to determine whether § 550(a)(2) allows the Trustee to recover this property. In a July 2014 decision, the court held on two grounds that the Trustee could not proceed with these actions. First, it held that the presumption against extraterritoriality limits the scope of § 550(a)(2), such that a trustee may not use it to recover property that one foreign entity received from another foreign entity. Second, and alternatively, the court held that international comity principles limit the scope of § 550(a)(2) on these facts. The district court did not dismiss any of the Trustee's complaints but

---

[3] The Appellees contest whether the money the feeder funds sent them came entirely from Madoff Securities. For the purpose of these appeals, however, the Appellees assume that the Trustee could trace the money back to Madoff Securities. We make the same assumption.

instead remanded to the bankruptcy court for further proceedings consistent with its opinion.

On remand, and following further factual development, the United States Bankruptcy Court for the Southern District of New York, Judge Bernstein, applied the district court's reasoning and dismissed the Trustee's claims against the Appellees.

First, the court dismissed the claims against the Appellees that invested with Fairfield, Kingate, and Harley on international comity grounds. The court found that the United States "has no interest in regulating the relationship between [these funds] and their investors or the liquidation of [these funds] and the payment of their investors' claims." *SIPC II*, 2016 WL 6900689, at *14. It also found that the foreign nations where those entities are in liquidation "[have] a greater interest [than the United States] in regulating the activities that gave rise to the Trustee's subsequent transfer claims, particularly the validity or invalidity of payments by [the funds] to [their] investors and service providers." *Id.* at *16; *see also id.* at *14.

Second, the bankruptcy court dismissed the recovery claims against the remaining Appellees under the presumption against extraterritoriality. Interpreting our precedent and the district court's opinion, the bankruptcy court

concluded that the factors relevant to determining whether the transactions were extraterritorial were the locations from which the transfers were made and sent and the location or residence of the initial and subsequent transferee. The court dismissed the Trustee's claims because he had not alleged facts sufficient to support a domestic nexus under these criteria.[4]

The Trustee appealed the orders dismissing the recovery actions. We consolidated those appeals and now resolve them under the following principles.

## DISCUSSION

We begin by unpacking the statutory scheme relevant to these appeals.

"SIPA serves dual purposes: to protect investors, and to protect the securities market as a whole." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011). To achieve these purposes, SIPA allows courts to appoint trustees, such as Picard, and endow them with certain authority over liquidation estates. This authority includes the power to "allocate customer property of the

---

[4] The court also found that some feeder funds had no connection to their country of organization, were managed and operated in the United States, and made their subsequent transfers from New York. It denied the motions to dismiss the actions involving their subsequent transfers and granted the Trustee leave to amend so he could show whether those transactions were domestic.

debtor," 15 U.S.C. § 78fff–2(c)(1), which SIPA defines as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted," *id.* § 78*lll*(4).

"Whenever customer property is not sufficient to pay in full the claims [against the debtor], the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the [Bankruptcy Code]." *Id.* § 78fff–2(c)(3).

The Trustee alleges Madoff Securities' initial transfers to the feeder funds are avoidable as fraudulent under § 548(a)(1)(A) of the Bankruptcy Code. That section provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

11 U.S.C. § 548(a)(1)(A).

Only once a transfer is avoided may a trustee recover the underlying

property. Section 550(a), the recovery provision, states:

> Except as otherwise provided in this section, to the extent that a
> transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or
> 724(a) of this title, the trustee may recover, for the benefit of the estate,
> the property transferred, or, if the court so orders, the value of such
> property, from . . . (1) the initial transferee of such transfer or the
> entity for whose benefit such transfer was made; or . . . (2) any
> immediate or mediate transferee of such initial transferee.

*Id*. § 550(a).[5] Relevant here is § 550(a)(2), as the Trustee seeks to recover property

from subsequent transferees.

## I.  The Presumption Against Extraterritoriality

The presumption against extraterritoriality is a canon of statutory

construction. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016). It

provides that, "[a]bsent clearly expressed congressional intent to the contrary,

federal laws will be construed to have only domestic application." *Id.* This canon

helps "avoid the international discord that can result when U.S. law is applied to

conduct in foreign countries." *Id.* It also reflects the "commonsense notion that

---

[5] Section 550(b) limits a trustee's ability to recover under § 550(a)(2) from certain
subsequent transferees who received property in good faith.

Congress generally legislates with domestic concerns in mind." *Id.* (quoting *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993)).

An action may proceed if either the statute indicates its extraterritorial reach or the case involves a domestic application of the statute. The courts below found that neither criterion was satisfied and accordingly dismissed these actions.[6]

Because the reach and applicability of a statute are questions of statutory interpretation, we review a lower court's application of the presumption against extraterritoriality *de novo. See, e.g., Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

### A. The Focus of § 550(a) in These Actions Is on the Debtor's Fraudulent Transfer of Property to the Initial Transferee.

The Supreme Court teaches that we must look to a statute's "focus" to determine whether a case involves a domestic application of that statute.

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the

---

[6] Although the Supreme Court has referred to this extraterritoriality analysis as a "two-step framework," these "steps" need not be sequential. *See id.* at 2101 & n.5. Courts generally begin by asking whether the statute indicates its extraterritorial reach, but they are free "in appropriate cases" to begin by asking whether the case involves an extraterritorial application of the statute. *Id.* at 2101 n.5. This is an appropriate case for beginning with the latter question because we hold that the transactions here were domestic, and the extraterritorial reach of a statute is of no moment when a case is truly a domestic matter.

> focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 136 S. Ct. at 2101. The Supreme Court recently explained how to identify a statute's focus in *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018).

*WesternGeco* involved § 271(f) of the Patent Act, which prohibits the export of component parts of a patented product for assembly abroad. *Id.* at 2135 (citing 35 U.S.C. § 271(f)(2)). Plaintiffs alleging infringement under § 271(f)(2) can recover damages under 35 U.S.C. § 284. *Id.* The Federal Circuit held that § 271(f) does not allow plaintiffs to recover for lost foreign sales and vacated a jury award premised on such damages. *Id.* (citing *WesternGeco LLC v. ION Geophysical Corp.*, 791 F.3d 1340, 1343 (Fed. Cir. 2015)). Reversing, the Supreme Court explained that "[t]he focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." *Id.* at 2137 (brackets omitted) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010)). "When determining the focus of a statute, we do not analyze the provision at issue in a vacuum." *Id.* (citing *Morrison*, 561 U.S. at 267–69). Instead:

> If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a "domestic application." And determining how the statute has actually been applied is the whole point of the focus test.

*Id.* (citation omitted) (citing *RJR Nabisco*, 136 S. Ct. at 2101).

Applying this principle, the Court identified the "overriding purpose" of the damages provision, § 284, as a remedy for infringement, because it asks how much a plaintiff is due because of infringement. *See id.* (quoting *General Motors Corp. v. Detox Corp.*, 461 U.S. 648, 655 (1983)). But because there is more than one way to infringe, the focus of § 284 depends on "the type of infringement that occurred." *See id.* In *WesternGeco*, that meant turning to § 271(f)(2), which the Court found focuses on domestic conduct because it regulates "the domestic act of 'suppl[ying] in or from the United States.'" *Id.* at 2137–38 (brackets in original) (quoting 35 U.S.C. § 271(f)(2)).

Thus, the Court held that "the focus of § 284, in a case involving infringement under § 271(f)(2), is on the act of exporting components from the United States," which is "domestic infringement." *Id.* at 2138. It rejected an argument that the statute focuses on damages, even though it authorizes them,

because "what a statute authorizes is not necessarily its focus." *Id.* Instead, the Court found that damages are "merely the means by which the statute achieves its end of remedying infringements." *Id.*

*WesternGeco* helps resolve two issues relevant to these cases: (1) whether we should look to the pertinent avoidance provision (here, § 548(a)(1)(A)) in determining the focus of § 550(a), and (2) the focus of § 550(a) in these actions.

### 1. We Must Look to § 548(a)(1)(A) to Determine the Focus of § 550(a) in These Cases Because the Provisions Work "In Tandem."

No one disputes that, in an action where a trustee seeks to recover property under § 550(a), we must at a minimum look to that section. The dispute is whether we must additionally look to the avoidance provision that enables a trustee's recovery. Section 550(a) applies only "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title." 11 U.S.C. § 550(a). In other words, a trustee cannot use § 550(a) to recover property unless the trustee has first avoided a transfer under one of these provisions.

Like the infringement and damages provisions of the Patent Act, the Bankruptcy Code's avoidance and recovery provisions work "in tandem." *See WesternGeco*, 138 S. Ct. at 2137. In any given case, "it would be impossible to

accurately determine" the focus of § 550(a) without asking *why* a trustee can use it—*i.e.*, the purpose of the avoidance provision that enables the recovery action. *See id.* ("[D]etermining how the statute has actually been applied is the whole point of the focus test."). Just as the focus of § 284 of the Patent Act depends on the infringement provision that enables a plaintiff to seek damages, the focus of § 550(a) of the Bankruptcy Code depends on the avoidance provision that enables a trustee to recover property.

Thus, to determine § 550(a)'s focus in a given action, a court must also look to the relevant avoidance provision.

### 2. When Working In Tandem with § 548(a)(1)(A), § 550(a) Regulates a Debtor's Fraudulent Transfer of Property, and It Therefore Focuses on the Debtor's Initial Transfer.

The focus of a statute is the conduct it seeks to regulate, as well as the parties whose interests it seeks to protect. *See id.* The district court found that § 550(a) focuses on "the property transferred" and "the fact of its transfer." *SIPC I*, 513 B.R. at 227. On this theory, it concluded that a recovery action under § 550(a)(2) regulates the subsequent transfer of property: that from the initial transferee to the subsequent transferee.

But the harm to the estate as a result of its unlawful depletion began with the initial transfer. Section 548(a)(1)(A) allows a trustee to "avoid any transfer . . . of an interest of the debtor in property" that the debtor "made . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). A general purpose of "the Bankruptcy Code's avoidance provisions, including 11 U.S.C. § 548, [is] protect[ing] a debtor's estate from depletion to the prejudice of the unsecured creditor." *In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006) (Sotomayor, *J.*) (agreeing with *In re French*, 440 F.3d 145, 150 (4th Cir. 2006)). Thus, § 548(a)(1)(A)'s purpose is plain: it allows a trustee, for the protection of an estate and its creditors, to avoid a debtor's fraudulent, hindersome, or delay-causing property transfer that depletes the estate. *See In re French*, 440 F.3d at 150 ("[Section] 548 focuses not on the property itself, but on the fraud of transferring it.").

Section 550(a) works in tandem with § 548(a)(1)(A) by enabling a trustee to recover fraudulently transferred property. Recovery is the business end of avoidance. In that sense, § 550(a) "is a utility provision, helping execute the policy of § 548[(a)(1)(A)]" by "tracing the fraudulent transfer to its ultimate resting place

(the initial or subsequent transferee)." Edward R. Morrison, *Extraterritorial Avoidance Actions: Lessons from Madoff*, 9 Brook. J. Corp. Fin. & Com. L. 268, 273 (2014); *see also In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (Bernstein, *J.*) (finding that when using § 550(a), "the trustee is essentially tracing property into the hands of the recipient—no different than a trustee under non-bankruptcy law").

We hold that, in recovery actions where a trustee alleges a debtor's transfers are avoidable as fraudulent under § 548(a)(1)(A), § 550(a) regulates the fraudulent transfer of property depleting the estate.[7] While § 550(a) authorizes recovery, "what a statute authorizes is not necessarily its focus." *WesternGeco*, 138 S. Ct. at 2138. When § 550(a) operates in tandem with § 548(a)(1)(A), recovery of property

---

[7] Section 548(a)(1)(A) allows a trustee to avoid a transfer on three grounds: that the debtor had "actual intent to [1] hinder, [2] delay, or [3] defraud any entity to which the debtor was or became . . . indebted." While this opinion concerns the third ground, we would apply the same logic in a case where a trustee sought to avoid transfers on the theory that the debtor sought to "hinder" or "delay" an entity. For example, if a trustee alleged that a debtor made a transfer intended to delay an entity, the focus of § 550(a) in that action would be on the delay-causing transfer of property that depletes the estate.

Section 550(a) may serve different purposes depending on which of the Bankruptcy Code's avoidance provisions enables recovery. We express no opinion on the focus of § 550(a) in actions involving any avoidance provision other than § 548(a)(1)(A).

is "merely the means by which the statute achieves its end of" regulating and remedying the fraudulent transfer of property. *See id.*

Thus, in actions involving both provisions, § 550(a) regulates the debtor's initial transfer. While the subsequent transfer may indirectly harm creditors by making property more difficult to recover, it is the initial transfer that fraudulently depletes the estate. Only the initial transfer involves fraudulent conduct, or any conduct, by the debtor.

The language of § 548(a)(1)(A) reflects this focus. It allows a trustee to avoid certain transfers "the debtor voluntarily or involuntarily . . . *made*." 11 U.S.C. § 548(a)(1)(A) (emphasis added). This can mean only the initial transfer, because the debtor has not *made* the subsequent transfer. Consequently, when a trustee seeks to recover subsequently transferred property under § 550(a), the only transfer that must be avoided is the debtor's initial transfer. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 480 B.R. 501, 524 (Bankr. S.D.N.Y. 2012) ("[A]s a court's recovery power is generally coextensive with its avoidance power, it is logical that the relevant transfer for purposes of the presumption against extraterritoriality is only the transfer that is to be avoided, namely the initial

transfer." (quotation marks omitted)); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 30 (S.D.N.Y. 2013).

Two Supreme Court decisions reinforce this conclusion. In *WesternGeco*, the Court found that "the focus of § 284, in a case involving infringement under § 271(f)(2), is on the act of exporting components from the United States." 138 S. Ct. at 2138. Here, the focus of § 550(a), in a case involving fraudulent transfers avoidable under § 548(a)(1)(A), is on the debtor's act of transferring property from the United States. In *Morrison*, the Court held that § 10(b) of the Securities Exchange Act of 1934 regulates "deceptive conduct in connection with the purchase or sale of [certain] securit[ies]," meaning the statute focuses on "purchase-and-sale transactions." 561 U.S. at 266–67 (quotation marks omitted). By analogy, § 550(a) regulates a debtor's unlawful conduct—its fraudulent transfer of property. The statute thus focuses on that initial transfer, rather than the subsequent transfer made by the feeder fund.

The lower courts held, and the Appellees now argue, that the relevant Bankruptcy Code provisions regulate the *subsequent* transfer of property. Their readings erroneously overlook how § 548(a)(1)(A) shapes the focus of § 550(a) here.

The district court, for example, correctly recognized that the extraterritoriality analysis must consider "the regulatory focus of the Bankruptcy Code's *avoidance and recovery* provisions." *SIPC I*, 513 B.R. at 227 (emphasis added). And while we agree with the court's finding that § 548(a)(1)(A) "focuses on the nature of the transaction in which property is transferred," *id.*, we reject its conclusion that the appropriate "transaction" to determine the extraterritoriality question is the subsequent transfer. The only transfer § 548(a)(1)(A) is concerned with is the initial transfer, as this is the only transfer "the debtor . . . made." *See* 11 U.S.C. § 548(a)(1)(A).

The Appellees would have us ignore § 548(a)(1)(A) entirely and look only to § 550(a)(2). For the reasons stated above, we refuse to "analyze the provision at issue in a vacuum." *See WesternGeco*, 138 S. Ct. at 2137.[8]

---

[8] The Trustee contends that certain provisions of SIPA provide additional reasons for us to find that § 550(a) focuses on domestic conduct in these actions. Because we reach that holding without looking to SIPA, we express no opinion on whether SIPA is relevant to the focus of the Bankruptcy Code's avoidance and recovery provisions in cases where SIPA trustees seek to use them.

### B. These Actions Involve Domestic Applications of the Bankruptcy Code Because § 550(a) Focuses on Regulating Domestic Conduct.

Recognizing that, in these actions, § 550(a) focuses on the debtor's initial transfer of property, we must decide whether Madoff Securities' transfers took place in the United States such that regulating them involves a domestic application of that statute. The lower courts, assuming the relevant transaction was the subsequent transfer, weighed the location of the account from which and to which the subsequent transfer was made, and the location or residence of the subsequent transferor and transferee. *See SIPC II*, 2016 WL 6900689, at *25. We decline to adopt this balancing test.

We hold that a domestic debtor's allegedly fraudulent, hindersome, or delay-causing transfer of property from the United States is domestic activity for the purposes of §§ 548(a)(1)(A) and 550(a).[9] The presumption against extraterritoriality therefore does not prohibit that debtor's trustee from recovering

---

[9] We recognize that our holding cites two nexuses to the United States: (1) the debtor is a domestic entity, and (2) the alleged fraud occurred when the debtor transferred property from U.S. bank accounts. We express no opinion on whether either factor standing alone would support a finding that a transfer was domestic.

such property using § 550(a), regardless of where any initial or subsequent transferee is located.

Our rule follows the Supreme Court's instruction that we look to "the conduct relevant to the statute's focus." *See, e.g.*, *RJR Nabisco*, 136 S. Ct. at 2101. The relevant conduct in these actions is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property. When a domestic debtor commits fraud by transferring property from a U.S. bank account, the conduct that § 550(a) regulates takes place in the United States.

That resolves these cases. Madoff Securities is a domestic entity, and the Trustee alleges it fraudulently transferred property to the feeder funds from a U.S. bank account. These transfers are domestic activity. Because § 550(a) therefore regulates domestic conduct, these cases involve domestic applications of the statute.

Factoring the transferee's receipt of property into our analysis would not only misread the Bankruptcy Code's avoidance and recovery provisions, but also open a loophole. One can imagine a fraudster who, anticipating his downfall, gives his entity's property to friends and family members before a court freezes its assets. The Bankruptcy Code's avoidance and recovery provisions ordinarily

allow a trustee to claw back this property. But what would happen if the fraudster transferred the property to a foreign entity that then transferred it to another foreign entity? Under the Appellees' theory of § 550(a), that transfer would make the property recovery-proof, even if the subsequent foreign transferee then sent the property to someone located in the United States. The presumption against extraterritoriality is not "a limit upon Congress's power to legislate," but a canon of construction meant to guide our understanding of a statute's meaning. *See Morrison*, 561 U.S. at 255. We cannot imagine how it should guide us to read the Bankruptcy Code's creditor-protection provisions in this self-defeating way.

* * *

The lower courts erred by dismissing these actions under the presumption against extraterritoriality. Because we find that these cases involve a domestic application of § 550(a), we express no opinion on whether § 550(a) clearly indicates its extraterritorial application.

## II. International Comity

The second issue is whether the district court erroneously dismissed these actions on international comity grounds. We apply international comity principles in two ways: "[first,] as a canon of construction, [comity] might shorten the reach

of a statute; [and] second, [comity] may be viewed as a discretionary act of

deference by a national court to decline to exercise jurisdiction in a case properly

adjudicated in a foreign state, the so-called comity among courts." *In re Maxwell*

*Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996). The first application

is "prescriptive comity" and asks a question of statutory interpretation: should a

court presume that Congress, out of respect for foreign sovereigns, limited the

application of domestic law on a given set of facts? *See Hartford Fire Ins. Co. v.*

*California*, 509 U.S. 764, 817 (1993) (Scalia, *J.*, dissenting). The second application is

"adjudicative comity." It asks whether, where a statute might otherwise apply, a

court should nonetheless abstain from exercising jurisdiction in deference to a

foreign nation's courts that might be a more appropriate forum for adjudicating

the matter. *See id.*; *see also Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms,*

*Inc.*, 466 F.3d 88, 93 (2d Cir. 2006).

We have previously declined to decide whether prescriptive and

adjudicative comity are "distinct doctrines." *See In re Maxwell*, 93 F.3d at 1047.

Although prescriptive and adjudicative comity sometimes demand similar

analysis,[10] each asks a different question and is rooted in a different legal theory. We therefore treat them as distinct doctrines, albeit related ones.[11]

This distinction reveals the appropriate standard of review for a lower court's order dismissing a case on international comity grounds. Prescriptive comity poses a question of statutory interpretation. We review those questions *de novo*.[12] *See, e.g.*, *Roach*, 440 F.3d at 56. Adjudicative comity abstention, on the other

---

[10] In particular, the existence of parallel proceedings can factor into both doctrines. *Compare In re Maxwell*, 93 F.3d at 1048, 1052 (holding, in the context of applying a prescriptive comity choice-of-law test, that the existence of parallel foreign proceedings can factor into a foreign state's interest in applying its law to a dispute), *with Royal & Sun*, 466 F.3d at 92 (explaining, as a principle of adjudicative comity, that the existence of parallel foreign proceedings is sometimes a factor weighing in favor of abstention). Thus, while this opinion focuses on prescriptive comity, we occasionally look to our adjudicative comity precedent in assessing the weight of any foreign state's interest in applying its law.

[11] Numerous courts and scholars have done the same. *See, e.g.*, *Hartford Fire Ins. Co.*, 509 U.S. at 817, 820 (Scalia, J., dissenting)); *Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("There are essentially two distinct doctrines [that] are often conflated under the heading international comity." (quotation marks omitted) (quoting *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 283 (S.D.N.Y. 2009)); Maggie Gardner, *Retiring Forum Non Conveniens*, 92 N.Y.U. L. Rev. 390, 392 (2017); *see also Royal & Sun*, 466 F.3d at 92 (describing these doctrines as different) (citing Joseph Story, Commentaries on the Conflict of Laws § 38 (1834)); *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("International comity, as it relates to this case, involves not the choice of law but rather the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction.").

[12] The question of whether we review prescriptive comity dismissals *de novo* or for abuse of discretion arose in *In re Maxwell*, 93 F.3d at 1051. Although this Court hinted that *de*

hand, concerns a matter of judicial discretion. We thus review adjudicative comity

dismissals for abuse of discretion. *See, e.g., Royal & Sun*, 466 F.3d at 92. "However,

because we are reviewing a court's decision to abstain from exercising jurisdiction,

our review is 'more rigorous' than that which is generally employed under the

abuse-of-discretion standard." *Id.* (quoting *Hachamovitch v. DeBuono*, 159 F.3d 687,

693 (2d Cir. 1998)). Thus, "[i]n review of decisions to abstain, there is little practical

distinction between review for abuse of discretion and review *de novo*." *Id.*

(quoting *Altos Hornos*, 412 F.3d at 422–23).[13]

---

*novo* review should apply, we declined to decide the issue because the parties did not
dispute the appropriate standard of review. *See id.* (noting that "[b]ecause the doctrine in
theory is relevant to construing a statute's reach, one might expect that [we should apply]
*de novo* review"). The Appellees dispute the appropriate standard here, but their
advocacy for abuse-of-discretion review relies on inapposite adjudicative comity cases.
*See* Appellee Br. 27 (citing, *e.g., In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 182 (2d Cir.
2016) ("We hold that the district court abused its discretion by not abstaining, on
international comity grounds . . . ."), *vacated on other grounds by Animal Sci. Prods., Inc. v.
Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865 (2018); *Altos Hornos*, 412 F.3d at 422
("Declining to decide a question of law on the basis of international comity is a form of
abstention, and we review a district court's decision to abstain on international comity
grounds for abuse of discretion.")).

[13] The Appellees argue that the higher standard of review announced in *Royal & Sun* does
not bind us, either because that case relied on a decision applying its rule to *Burford*
abstention or because *Royal & Sun* "has been superseded" by later cases. Appellee Br. 28–
29; *see also Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Both points are wrong. *Royal & Sun*
itself was not a *Burford* case; it involved adjudicative comity abstention. *See* 466 F.3d at
92. And the argument that our subsequent cases not using *Royal & Sun*'s "more rigorous"
language silently "superseded" that case is a nonstarter. *See, e.g., Veltri v. Bldg. Serv. 32B-*

The lower courts held that comity principles require "choice-of-law analysis to determine whether the application of U.S. law would be reasonable under the circumstances, comparing the interests of the United States and the relevant foreign state." *SIPC I*, 513 B.R. at 231 (citing *In re Maxwell*, 93 F.3d at 1047–48). This is a question of prescriptive comity because it asks whether domestic law applies, rather than whether our courts should abstain from exercising jurisdiction. The bankruptcy court and both parties agree with this framing. We therefore analyze the lower courts' decisions through the lens of prescriptive comity.[14]

\* \* \*

At the threshold, "[i]nternational comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction." *In re Maxwell*, 93 F.3d at 1049. A true conflict exists if "compliance with the regulatory

---

*J Pension Fund*, 393 F.3d 318, 327 (2d Cir. 2004) ("One panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." (citation, brackets, and quotation marks omitted)).

[14] In a footnote, the Appellees separately argue that we should decline to exercise jurisdiction on adjudicative comity grounds. *See* Appellee Br. 68 n.33. "We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) (per curiam).

laws of both countries would be impossible." *Id.* at 1050 (citing *Hartford Fire*, 509 U.S. at 799). *In re Maxwell* held that "a conflict between two avoidance rules exists if it is impossible to distribute the debtor's assets in a manner consistent with both rules." *Id.*[15]

The record is unclear about whether issues litigated in the feeder funds' liquidation proceedings abroad would yield outcomes irreconcilable with the relief the Trustee demands in these cases.[16] While the Appellees allege that there are conflicts, we merely assume without deciding that these conflicts exist.[17]

Prescriptive comity "guides our interpretation of statutes that might otherwise be read to apply to [extraterritorial] conduct." *Id.* at 1047. The doctrine

---

[15] In that decision, the panel found a true conflict between English and domestic law because "the parties . . . assumed that . . . English law would dictate a different distributional outcome than would United States law." *Id.*

[16] The district court found that BVI courts had "already determined that Fairfield Sentry could not reclaim transfers made to its customers under certain common law theories" and found this conclusion in conflict with the relief the Trustee now demands. *SIPC I*, 513 B.R. at 232. The Trustee disputes this finding. We decline to decide whether this allegation establishes a true conflict between domestic and foreign law.

[17] These consolidated appeals involve hundreds of Appellees that invested with numerous feeder funds, each involved in its own dispute below. Whether domestic adjudication would conflict with foreign adjudication may turn on different facts in different cases. The parties did not adequately brief us on how we should analyze these distinctions under our comity precedent. We therefore decline to address the issue.

does not require clear evidence that a statute does not reach extraterritorial conduct. *Id.* Rather, the doctrine is "simply a rule of construction" and "has no application where Congress has indicated otherwise." *Id.*

Comity in bankruptcy proceedings is "especially important" for two reasons. *Id.* at 1048. "First, deference to foreign insolvency proceedings will, in many cases, facilitate 'equitable, orderly, and systematic' distribution of the debtor's assets." *Id.* (quoting *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985)). "Second, Congress explicitly recognized the importance of the principles of international comity in transnational insolvency situations when it revised the bankruptcy laws." *Id.* (citing 11 U.S.C. § 304 (repealed 2005)). In light of these considerations, "U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding," *Altos Hornos*, 412 F.3d at 424, because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding," *id.* (brackets in original) (quoting *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)).

To enforce these principles, *In re Maxwell* announced a choice-of-law test. This test "takes into account the interests of the United States, the interests of the

foreign state, and those mutual interests the family of nations have in just and efficiently functioning rules of international law." *In re Maxwell*, 93 F.3d at 1048.

The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property. The prospect of recovery assures creditors and investors that they will receive their fair share of property in the event an American entity enters into bankruptcy or liquidation. Providing this safeguard is an important goal of the Bankruptcy Code's avoidance and recovery provisions. *See, e.g.*, *Universal Church v. Geltzer*, 463 F.3d 218, 224 (2d Cir. 2006) (noting that a result that would undermine § 548(a)(2)'s avoidance provision "would be absurd because it would defeat the entire purpose of allowing trustees to protect and enhance the estate by avoiding [unlawful] transfers"). These features consequently benefit the American economy by making domestic entities more attractive to creditors and investors. Protecting these individuals, and therefore protecting our securities market, are the key purposes of SIPA. *See In re Madoff Securities*, 654 F.3d at 235.

When a debtor in American courts is also in liquidation proceedings in a foreign court, the foreign state has at least some interest in adjudicating property disputes. In appropriate cases, that interest will trump our own. *See In re Maxwell*,

93 F.3d at 1052. But no such parallel proceedings exist here—the feeder funds, not Madoff Securities, are the debtors in the foreign courts.[18] And the absence of such proceedings seriously diminishes the interest of any foreign state in our resolution of the Trustee's claims.[19]

The only foreign jurisdictions potentially interested in these disputes are those where a feeder fund that served as an initial transferee is in liquidation. But these interests are not compelling. Although "U.S. courts should ordinarily decline

---

[18] We agree with Judge Batts, who employed similar reasoning in declining to dismiss class actions brought by Kingate investors against managers, consultants, administrators, and auditors associated with Kingate on adjudicative comity grounds:

> Although Defendants are correct that under Second Circuit law, foreign bankruptcy proceedings are generally given extra deference, . . . it is the [Kingate] Funds, rather than the Defendants, who are in liquidation in BVI and Bermuda. Thus, it is not clear that the normal justification for deferring to foreign bankruptcy proceedings, to allow "equitable and orderly distribution of a debtor's property," would apply under these circumstances.

*In re Kingate Mgmt. Ltd. Litig.*, 09-5386 (DAB), 2016 WL 5339538, at *35 (S.D.N.Y. Sept. 21, 2016) (citations and footnote omitted), *affirmed*, No. 16-3450, 2018 WL 3954217 (2d Cir. Aug. 17, 2018).

[19] *In re Maxwell* itself emphasized the importance of parallel foreign proceedings to its holding. *See* 93 F.3d at 1052 ("In the present case, in which there is a parallel insolvency proceeding taking place in another country, failure to apply § 547 and § 502(d) does not free creditors from the constraints of avoidance law, nor does it severely undercut the policy of equal distribution. . . . [*But*] *a different result might be warranted were there no parallel proceeding* [*abroad*]—*and, hence, no alternative mechanism for voiding preferences* . . . ." (emphasis added)).

to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding," *Altos Hornos*, 412 F.3d at 424, the Trustee is not a creditor and his claims are not the subject of a foreign bankruptcy or liquidation proceeding, *see SIPC II*, 2016 WL 6900689, at *12 ("[T]here are no parallel foreign avoidance actions in which the Trustee seeks to recover from the Subsequent Transferees.").

Nor is the Trustee duplicating the liquidations of the feeder funds. The proceedings have different means and goals. The Trustee's task is tracing property of the estate to net winners among the feeder funds' investors. But the feeder funds' liquidations proceed under those funds' organizing documents, which are unlikely to discriminate between net winners and net losers.

Further, we defer to foreign liquidation proceedings because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding." *Altos Hornos*, 412 F.3d at 424 (quoting *Finanz AG*, 192 F.3d at 246). This rationale makes sense where a creditor, unable to recover against a debtor in foreign court, attempts to do so in our courts. But in these cases, domestic law is also concerned with "equitable and orderly distribution"—of the Madoff Securities estate. Consolidating the Trustee's claims in federal court is more "equitable and orderly" than forcing him to litigate

different claims in different countries. SIPA and the Bankruptcy Code envision a unified proceeding, and we would frustrate this goal if we limited the reach of § 550(a) in these actions.

This is not to say the nations adjudicating the feeder funds' liquidations have no interest in these disputes. Those nations may wish to ensure that the feeder funds' creditors can recover as much property as possible. If the Trustee succeeds in these recovery actions, his success might frustrate the efforts of those entities' trustees to recover the same property in foreign court.

But those are not the comity concerns our precedent discusses in explaining when and why the Bankruptcy Code should give way to foreign law. Nor do we find them compelling enough to limit the reach of a federal statute that would otherwise apply here. The Bankruptcy Code gives us no reason to think Congress would have decided that trustees looking to recover property in domestic proceedings are out of luck when trustees in foreign proceedings may be interested in recovering the same property. In fact, § 550(a)(2) suggests the opposite: that by allowing trustees to recover property from even remote subsequent transferees, Congress wanted these claims resolved in the United States, rather than through piecemeal proceedings around the world.

We therefore hold that the United States' interest in applying its law to these
disputes outweighs the interest of any foreign state. Prescriptive comity poses no
bar to recovery when the trustee of a domestic debtor uses § 550(a) to recover
property from a foreign subsequent transferee on the theory that the debtor's
initial transfer of that property from within the United States is avoidable under
§ 548(a)(1)(A), even if the initial transferee is in liquidation in a foreign nation.

The lower courts, erroneously focusing on the subsequent transfer, found
that the jurisdictions adjudicating the feeder funds' liquidations had a greater
interest in resolving these disputes than the United States. The bankruptcy court,
for example, concluded that "[t]he United States has no interest in regulating the
relationship between the [feeder funds] and their investors or the liquidation of
the [feeder funds] and the payment of their investors' claims." *SIPC II*, 2016 WL
6900689, at *14. It did so by assuming "[t]he United States' interest is purely
remedial; the Bankruptcy Code allows the Trustee to follow the initial fraudulent
transfer into the hands of a subsequent transferee." *Id.*

This conclusion rests on incorrect premises: that we should look only to
§ 550(a), assume the United States has purely remedial interests, and focus on the
subsequent transfer of property. As we have explained, § 548(a)(1)(A) informs

38

§ 550(a)'s focus in these actions. That focus is on regulating and remedying a debtor's fraudulent transfer of property, and this means the relevant transfer is the debtor's initial transfer. The domestic nature of those transfers, and our nation's compelling interest in regulating them, tips the scales of *In re Maxwell*'s choice-of-law test in favor of domestic adjudication.

The district court found that "investors in these foreign funds had no reason to expect that U.S. law would apply to their relationships with the feeder funds." *SIPC I*, 513 B.R. at 232. But the court's premise is inaccurate. U.S. law is not regulating the investors' relationships with the feeder funds. It is regulating the debtor's property transfers to the feeder funds. Although regulating these transfers with recovery actions will affect the subsequent transferees, that consequence should not unfairly surprise them. When these investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going.

Finally, the district court observed that "the defendants here have no direct relationship" with Madoff Securities. *Id.* But the reason § 550(a)(2)'s tracing provision applies to *subsequent* transferees is ensuring that a trustee *can* recover from entities with no direct relationship to the debtor. If the directness of a transfer

were relevant to a trustee's ability to recover property under § 550(a)(2), we cannot see how a trustee could ever recover property from any subsequent transferee, foreign or domestic.

In sum, we find that prescriptive comity considerations do not limit the reach of the Bankruptcy Code provisions in these actions.

## CONCLUSION

We **VACATE** the bankruptcy court's judgments dismissing these actions and **REMAND** for further proceedings consistent with this opinion.